THOMAS & WILLIAM H. MOUNT *v.* OSMOND HARRIS.

Personal may as well be the subject of a conditional sale as real property. And although possession may be *prima facie* evidence of ownership, yet it is subject to be rebutted.

Property, purchased upon conditions, cannot be levied on by the creditors of the purchaser after the conditions have failed—and especially if the parties had previously rescinded the contract.

A sale of a negro girl, coupled with an agreement to return her to the vendor, if the purchase money be not paid by a given time, is a conditional, and not an absolute sale.

APPEAL from the superior court of chancery.

The bill of sale made by Gallaway to Cook, and the note given by Cook for the purchase money, are set out *verbatim* in the brief of the counsel for the appellee; and the other facts of the case sufficiently appear in the opinion of the court.

*D. C. & R. W. Briggs,* for appellants.

The writings which were interchanged between the parties to the contract, Cook & Gallaway, embody the contract, and the entire contract; for although the deposition of Cook alleges a promise on his part, to pay him for the slave, he states that this promise was made at the time the bill of sale was made. It cannot, therefore, be regarded as in any manner affecting or modifying the contract, evidenced by the instruments of writings, which are the deliberate expression of all that the parties intended in the premises.

And we contend that, according to the terms of the contract, the sale from Gallaway to Cook was absolute, complete, and dependent upon no condition or contingency whatsoever. The words of the bill of sale are : " I trade to Thomas Cook a negro girl, &c."—words as expressive as " bargain, sell and deliver." Possession followed this sale, and perfected it ; and this possession was continued until after Cook left the State, in July, 1840.

It is true it was stipulated that if Cook did not pay the pur-

chase money for the slave on the first of January thereafter, he (Cook,) should return her.   In other words, that if the purchase money were not paid some nine months after the time of sale, the negro, which had been " traded" to Cook, should be, by Cook, transferred again to Gallaway.

Inasmuch as the writings, which embody the contract, are such as are not required by law to be registered, and which, consequently, furnish no notice to creditors and the public, the right of Gallaway to a return of the slave, resolves itself into a secret lien, or trust, upon the slave, while in the hands of Cook, the owner to whom she had been " traded," and who was enabled to obtain credit upon the faith in his ownership of her, or into a bare security for the payment of the purchase money, which was the object of the sale; and this view is fortified by the fact, that there was no provision made for the payment of hire for the slave (for we have before remarked, that there is no evidence of such provision, which can be regarded by the Court) for the time she should remain in the possession of Cook, in the event that Cook should return her on 1st January, 1841.   Can it be supposed, that any man at all regardful of his own interest, would make a conditional sale of valuable property—place the period of performance of the condition at nearly one year thereafter—and make no provision for the payment of due compensation, should the condition not be complied with?

We think there is no doubt, that, had the slave died while in the possession of Cook, he would have been bound to pay the purchase money for her; and that it was in the power of said Cook, at any time between the day of delivery of the slave to him, and the first of January, 1841, (by the time when the note was payable,) by a sale and delivery, to have made a perfect title and transfer of her to any innocent purchaser.   If, during the period specified, the slave were not the property of Cook, to whom did she belong?   Assuredly not to Gallaway.   He had " traded" her—(to repeat the language of his bill of sale)—possession had been given—he had stipulated for no hire—he had but a promise from Cook, that if the note given for the purchase money were not paid, Cook would return him the slave.   If the title be not in Gallaway, it must be in Cook; and whatever

might be the bearing and consequences of the contract, as between Cook and Gallaway, so far as the rights of Cook's creditors are concerned, the full title of ownership was in him.

Viewing this promise to return the slave, sold to Cook, as a lien or secret trust, an attempt, on the part of the vendor, to create a "purchase money lien," on the sale of a chattel, and by a promise "*in pais*," to attain all that could be attained by a mortgage, or deed of trust, regularly recorded, the case hereby presented to the court, is strikingly analogous to that disclosed in *Howes* v. *Ball*, 7 Barn. & Cres. p. 481.

In that case Howes bought a coach of Ball—a written agreement was drawn, by which Howes agreed to give Ball certain bills, payable thereafter, for $100, and "Ball was to hold a claim on the coach until the debt was paid." Possession of the coach was given to Howes—Howes died—the coach was sent by the administrator of Howes, to the shop of Ball to be repaired—Ball retained the coach, and refused to give it up, until the bills aforesaid were paid. But trover was sustained by the administrator of Howes, and the construction placed by the court on the instrument of writing in that case, is set forth in these words : (making it) " a license given by Howes to Ball, to resume possession of, and retain the coach, in case Howes did not pay the bill. Construing it as a license, it is a personal license, not available against any one to whom Howes might transfer the property. It could not therefore be available against his administrator, to whom the property come by operation of law.

And this was, in effect, deciding that the right of the vendor to resume possession—in other words, the secret lien or trust in his favor, was void as to creditors, inasmuch as the administrator was a trustee for them.

It is difficult to perceive any material difference between the case quoted and the case at bar ; for, in the latter, the promise of Cook to return the slave, was, at most, an undertaking that the vendor should "resume and retain possession" of her, in case the purchase money were not paid.

In the case *Hussey* et. al. v. *Thornton*, et. al. 4 Mass. Rep. 405, it was held, that if one sell goods, stipulating that the vendee shall furnish a surety, or re-deliver the goods, and that the vendor

would not consider the goods as sold until the conditions should be fulfilled, the property on the goods will be in the vendor, as against creditors of the vendee, whose demands accrued before the delivery of the goods to the vendee; but otherwise as to creditors, whose demands accrued while the goods were in the possession of the vendee, so that it might be fairly presumed, a false credit was given him, (the vendee.)

Here, in favor of creditors, the express agreement, that the title should not pass out of the vendor until a certain condition was performed by his vendee, was disregarded in favor of creditors, " who might be presumed" to have given credit on the faith of apparent ownership.  In the case now before the court, the parties to the contract not only did not expressly stipulate that the title should not pass until the condition should be performed, but, on the contrary, selected the strongest language to express a full and absolute sale and transfer.  And in full view of this decision, we may assert, that, as the transfer in the present case was absolute, it is not necessary to inquire at what point of time the claim sought to be enforced by T. & W. H. Mount, arose. Yet may not the inquiry be safely made?  It is true, there is no evidence in the record to show at what time the credit, on which their claim is predicated, was given to Cook; the only time when the existence of their claim is shown, is the issuance of their process of attachment.  This was after Cook's departure.  The credit, of necessity, must have been given Cook before his departure.  The debt then existed when the slave was in possession of Cook; (for she was in his possession when he fled the State;) and until the party who assisted Cook in a fraud upon the public, by giving him apparent mastership of the slave, shall have shown that those claims arose before the transfer of the slave to Cook—may it not, in the language of the decision last quoted, " be fairly presumed that all debts, which were sought to be coerced out of the property of Cook· after his departure, were created upon the faith of all the property which he held at the time of his departure?"  Such a construction would seem to be legitimate, and fully to quadrate with the spirit of the decisions before cited; than which, none

could be more conservative of the public interests, enforcing, as they do, the principle that no vendor shall assist his vendee to mislead the public, and gain a fictitious credit by allowing him to exhibit to that public, the only *indicia* of title to chattels, viz., public possession and the appearance of ownership, while the vendor holds a latent lien—a secret defeasance to spring upon the creditor, who has acted upon the best and the only evidence attainable by him.

Although the case *Bayley* v. *Greenleaf*, 7 Wheaton Rep. 46, is not strictly and technically a "case in point," it may be cited as showing the strong effort of the courts to protect creditors against all secret trusts. There was an attempt made in that case, to enforce a purchase money lien against the creditors of the vendee of real estate; and the language of Marshall, Chief Justice, is, " if such lien has ever been enforced against creditors in any of the States, or in any court of the United States, the decision is unknown to us;" he adds, "in the United States, the claims of creditors stand on high grounds—there is not, perhaps, a State in the Union, the laws of which do not make all conveyances, not recorded, and all secret trusts, void as to creditors, as well as subsequent purchasers without notice."

It were superfluous to remark how much the more strongly the reasons for enforcing the enlightened public policy advocated in the foregoing decisions, apply to secret liens affecting personal estate, than to those affecting real estate.

Nor can it avail the appellee anything that the slave came into his possession before the process of attachment was executed; in the case cited from 7 Barn. and Cres. p. 481, the coach upon which the vendor sought to retain a secret lien, came again into his (the vendor's) possession; yet this did not do away with the right of the administrator of the vendee, to cause it to be applied in the due course of administration for the benefit of creditors.   When once the rights of creditors have been attached —whenever credit shall have been given upon the faith of possession of certain property, that property is set apart—dedicated, as it were, by the policy of the law, to the satisfaction of the debts whose existence was caused by it.

If Gallaway's right to resume possession of the slave was annihilated, so far as creditors are concerned, of course, his transferree, Ormond Harris, has no such right.

Equally important to affect the right of creditors, is the evidence which Cook has vouchsafed to give—that he "recanted the trade" some time before he left the State. He admits that he kept possession of the slave until he did depart; it is, too, somewhat strange that he and Gallaway should have "recanted the trade," when the endorsement on the note shows that all interest in the slave—all right to receive the purchase money for her, passed to Harris two days after the note was made, and that Gallaway had no right to act in the premises at all. Had Gallaway, however, been still the owner of the note, no agreement between him and Cook, (then owning the slave,) could impair the rights of creditors, unless possession of the slave had passed from Cook to Gallaway, in conformity to such agreement.

Mr. Cook was not pleased to pay that deference to the rules of law and the rights of creditors, which would have been argued from a transfer of possession of the slave. He preferred to retain her, and his bill of sale, and to allow his note for the purchase money, and his promise to return the slave, if the same were not paid, to remain outstanding in the hands of a third person, (the appellee.)

The continuance of possession of the slave in Cook, the possession obtained under the contract, effectually secures the rights of creditors. Those rights had attached in consequence of the possession so originally obtained and kept up; and any convention Cook may have made in the interim was void as to them.

What is there in the case which should call for the interposition of a court of equity? The complaint of hardship, on the part of Harris, is easily answered by the suggestion, that Gallaway, to whose right he wishes to be substituted, might have, by the simple experiment of a deed of trust, or mortgage, effectually secured his lien and prevented the possibility of a fraud on creditors.

May it not well be inquired, what equity does the complainant Harris exhibit, which should outweigh, or be equal to, that

existing in favor of the creditors of Cook? Harris has purchased a note upon Cook, and a promise by Cook to pay it, or return a chattel for which it was given. T. & W. H. Mount have given Cook credit upon the faith of the apparent ownership of that chattel—loss must fall upon one or the other—upon whom should it fall? We apprehend that to this, there can be but one answer, and that answer warranted by the soundest and most comprehensive policy. That this loss should fall upon him, who has so acted as to mislead the public; who has deliberately chosen to withhold from the public the notice which, given by a registered deed, would have avoided all jeopardy of its interests, and who, literally, and by no figure of speech, may be said to have caused the creation of debts, and to be now striving to withdraw and appropriate to himself the fund which he caused to be proffered as the inducement to the public to give credit to another, and without which that credit would never have been given.

*Clifton*, for appellee.

The appellants put their case upon the ground that the sale from Gallaway to Cook was absolute. I contend it was conditional; and that the law is clearly with the appellee.

The intention of the parties is the pole-star in the construction of contracts; and that construction which carries out the intention, must prevail unless it conflicts with established principles.

The contract, in this case, is very inartificially drawn, yet its terms are so plain, that it is impossible to mistake the intention of the parties to it: "I, Moses Gallaway, of the first part, do, trade to Thomas Cook of the second, a negro girl named Matilda, for which said Cook gives his note for $900, due 1st January, 1841, which said Cook is to pay him, said Gallaway, or return him, said Gallaway, the above mentioned negro girl Matilda." Signed, "Moses Gallaway."

At the same time, Cook executed his note to Gallaway, in these terms: "On or before the first day of January next, I promise to pay Moses Gallaway $900, or return him a negro girl, Matilda. March 17, 1840." Signed, "Thomas Cook."

It thus appears that Gallaway did not intend to part with the ownership of the slave, unless he received the purchase money at the time stipulated for its payment, and Cook, on his part, agreed, that if he did not pay it at that time, he would return the girl. The language employed by the parties repels the idea of an absolute sale, by Gallaway, when it declares that Cook was to pay the money or return the girl, and shows, conclusively, that the sale depended upon a condition precedent—that is, the payment of the money by Cook.

This condition was an essential part of the contract, and had to be performed before the title vested in Cook. It never was performed, and the slave, therefore, never became the property, nor was liable to the debt of any creditor of Cook.

The rule is, that where there is a condition precedent attached to a contract of sale and delivery, the property does not vest in the vendee, on delivery, until he performs the condition—and the right remains in the vendor even against the creditors of the vendee. *Hammond* v. *Anderson*, 4 Bos. & Pull. 69. *Shepley* v. *Davis*, 5 Taunton, 617. *Barrow* v. *Coles*, 3 Camp. 93. *Bishop* v. *Shillito*, 2 Barn. & Adol. (n) 329. *Hussey* et al. v. *Thornton* et al. 4 Mass. R. 405. *Barrett* v. *Pritchard*, 2 Pickering, 512. 2 Kent, (2d edition) 497.

The case of *Howes* v. *Ball*, referred to by appellants, is not in point, either as to the original contract, or as to the circumstances by which the vendor became repossessed of the property.

There is a difference between a contract, to which there is a precedent condition attached—that the vendee shall pay the purchase money before he acquires the title—and one in which the vendor sells and retains, or stipulates for a lien or claim on the property, for the payment of the purchase money.

In the former, the vendor does not part with the title until the precedent condition is performed. In the latter, there is a sale of the property made absolute by delivery, and an attempt to secure the debt due by the vendee therefor, by a claim or lien on the property purchased. It is an admission, on the part of the vendor, that the property belongs to the vendee, as no one but the owner -

of property can give a lien on it to secure a debt due by him. But this was no case for a lien. Lien, in its proper sense, is a right which the law gives, and this was an attempt to extend a lien to a case not embraced by law; it became, therefore, or could only be, a pledge, to the efficacy of which, so far as third persons are concerned, possession is indispensable. Montagu on Lien, p. 36 and notes.

"Howes and Ball" was adjudged—the case of a license given by Howes to Ball to resume possession of, and retain the coach, in case Howes did not pay the bills—and a personal license, not available against any one to whom Howes might transfer the property, and there being a transfer by operation of law to his administrator, it could not be available against him. However strange this conclusion may be, the case is made by Lord Tenterdon to turn upon the point of a transfer by the vendee, and nothing is said as to the rights of creditors.

The effect of a transfer of the property, by Cook, to the prejudice of his vendor, in this case, it is unnecessary to inquire, as there was no such transfer.

In the case of *Hussey* et al. v. *Thornton* et al., the court sustains a contract to which, like this, there was a precedent condition attached; but the court adds, very unnecessarily, that its decision would be otherwise, if the demands of the creditors had accrued whilst the goods were in the possession of the conditional purchaser, so that it might be fairly presumed a false credit was given to him. The point before the court was the only one decided; it is authority for the appellee, and we do not feel called upon to combat what is said on one that was not presented.

The appellants, however, seize upon this observation of the court, and seek to use it in support of their cause—admitting, at the same time, that there is no evidence in the record, to show at what time the credit on which their claim is predicated, was given to Cook. The case of the appellee is, *prima facie,* within the rule laid down by all the cases. If there were in it special circumstances, which would deprive it of the benefit of that rule,

it was for the appellants to show them—failing to do so, the conclusion is, they did not exist.

Cook, unable to pay the money for the slave, rescinded the contract. After he left the country, the slave and the bill of sale were delivered to the appellee, to whom the note, and all Gallaway's interest in the contract, had been transferred some months before.

In this, the parties did nothing which it was not competent for them to do. There was no fraud committed or intended; no deception practiced or designed. The rescission of the contract was in good faith and for a valuable consideration, and did not affect, or in any manner interfere with the rights of the appellants. They had no judgment against Cook, nor lien of any description on his property, and putting it on the ground that the sale was absolute, they would have great difficulty in establishing their claim against the appellee, who, in the worst aspect, would only stand as a preferred creditor.

But it is so clear that this is the case of a conditional sale, and that the rights of the parties must be decided on that basis, that I find no apology for considering it in any other light.

PER CURIAM. By the bill it appears that on the 17th of March, 1840, Moses Gallaway, one of the respondents, sold to Thomas Cook, another of the respondents, a negro woman, for which Cook was to pay, on the 1st of January following, nine hundred dollars. The bill of sale contains on its face the condition, that in case Cook failed to pay at the time specified, then the negro woman was to be returned to Gallaway; and the note given for the purchase money, contains the same stipulation. On the 19th of March, Gallaway transferred his entire interest in the contract to the complainant, Harris; by which assignment, Harris was substituted to all the rights of Gallaway. Some time in the summer of that year, Cook left the State, after declaring to Gallaway that he would not be able to make the payment, and would return the slave. After Cook's departure, the slave and the bill of sale were delivered to the complainant. The respondents sued out attachments against Cook as an abscond-

ing debtor, which were levied on the slave then in possession of the complainant, as the property of Cook, to enjoin proceedings on which the bill was filed. The answer of Gallaway admits every allegation contained in the bill, and asserts that the sale was only conditional. The disposition of Cook, also, fully sustains the allegations. He also proves that he told Gallaway that he could not comply with the contract, and would deliver up the negro; and when Gallaway came for her, he obtained permission to retain her on hire for a few weeks, in consequence of the sickness of his wife. On this state of facts, the chancellor decreed for the complainant, and the respondents appealed.

It is contended that the contract between Gallaway and Cook, amounted to an absolute and unconditional sale, and that the negro was consequently liable to the attachments as Cook's property. Such, however, does not seem to have been the intention of the parties, and that intention must regulate the construction of the contract. The bill of sale is in these words; " I, Moses Gallaway of the first part, do trade to Thomas Cook of the second, a negro girl named Matilda, for which said Cook gives his note for nine hundred dollars, due 1st January, 1841, which said Cook is to pay him, the said Gallaway, or return him, the said Gallaway, the above mentioned negro girl, Matilda." The note is also in the alternative that Cook was to pay the money or return the negro girl. From these instruments, it seems that Gallaway did not intend to part with his right to the negro girl, until the money should be paid; and there is no legal principle which converts the contract into an absolute one, unless there be some evidence that such was the intention of the parties. Personal property may as well be the subject of a conditional sale as real property; and although possession may be *prima facie* evidence of ownership, yet it is subject to be rebutted. The case of *Howes* v. *Ball*, cited in the argument, is distinguishable from this. That was an absolute sale of the coach, but the vendor was to hold a claim on it until the bills were delivered in payment. The claim was, at most, nothing more than a mere lien; the right of property had vested by the

sale. Here the rights of property did not pass except on the performance of a condition. The vendor retained more than a lien; he did not part with the right. Although this case is similar in some of its features to that of *Hussey* et al. v. *Thornton*, referred to by counsel, there is also at least one material difference. It was there held that such a sale would be regarded as absolute as to creditors who had given credit whilst the property was in possession of the vendee. Here, it does not appear that any such credit was given, and the limited duration of Cook's possession renders it probable that no such credit was given.

But there is an additional circumstance in this case, which must be decisive of the question, even if there was any doubt about the nature of the contract. It is competent for parties to rescind a contract; and such rescission will cut out liens subsequently acquired on claims against the vendee. The testimony fully warrants the conclusion that the contract was rescinded. To say the least of it, Gallaway had retained a lien for the purchase money; Cook acknowledged that he would not be able to pay it, and proposed to return the negro—which return was in effect made when he obtained permission to retain her for a short time on hire. And the rescission was absolutely completed, by the delivery of the negro and the title paper to the complainant, before the levy of the attachments. We cannot doubt, therefore, but what the decree of the chancellor was correct; and it must, consequently, be affirmed.